Paula Kramer, Appellant, v City of New York et al., Defendants, and Mark Lazansky, Respondent.

First Department, May 31, 1990

*Alexander J. Wulwick* of counsel *(Nassy & Hill,* attorneys), for appellant.

*Alan G. Krams* of counsel *(Barry P. Schwartz* with him on the brief; *Victor A. Kovner, Corporation Counsel,* attorney), for respondent.

### OPINION OF THE COURT

CARRO, J.

We are confronted with the question of whether a notice of claim is required where a cause of action sounding in fraud is alleged against a doctor, when the fraudulent acts were separate from, and subsequent to, acts giving rise to malprac-

tice claims by plaintiff against the doctor and his municipal employer. For the reasons that follow, we conclude that, insofar as the fraud claim is concerned, plaintiff was not bound by the notice of claim provisions of the General Municipal Law.

Plaintiff-appellant Paula Kramer was diagnosed as having scoliosis in 1962, when she was 10 years old. On July 12, 1964, she was admitted to Jacobi Hospital (Jacobi), which is owned by defendant City of New York (the City) and operated and managed by defendant Health and Hospital Corporation (HHC), where defendant-respondent Dr. Mark Lazansky performed surgery to correct the condition. Lazansky was, at the time, employed by HHC pursuant to an affiliation contract between the City of New York and Yeshiva University/Albert Einstein College of Medicine.

Plaintiff was discharged from Jacobi in October 1964; however, her treatment continued on a periodic out-patient basis. Plaintiff testified, both at examinations before trial (EBT) and at a pretrial hearing conducted pursuant to General Municipal Law § 50-h, that on one of those visits, some two years later in 1966, she heard some of the doctors and medical staff making jokes about her. When she asked what the joke was, one of the doctors told her "we are looking at your x-rays, at your sponge." When the mystified plaintiff then queried what sponge they were referring to, "all of a sudden everybody got very upset." The doctors "got very quite" and "very flustered".

Later that day, upon plaintiff's inquiry, Lazansky allegedly "told us there was a surgical sponge that had been left inside and that it won't cause any problems, that we didn't have to worry about it. *That the most it would cause would be a surgical surface infection,* and that it would be very easy to remove." (Emphasis added.) While Lazansky acknowledged that the sponge had been unintentionally left in plaintiff's body, "the one thing that he was clear that it would not be *[sic]* would not cause further problems."

Thus, plaintiff asserts that in reliance upon Lazansky's misrepresentations, she did nothing with regard to the sponge. Instead, she simply continued on her course of medical supervision, having routine X rays taken every six months, until 1968, when she was 16 years of age.[1] No course of action was ever recommended with regard to the sponge during this period.

---

1. Plaintiff did not see Lazansky on any of these subsequent occasions.

In March 1986, plaintiff developed "really excruciating" and "constant" pain and stiffness in her lower back and legs. She consulted an orthopedist, to whom she gave a detailed account of her prior medical history vis-à-vis her back, including, *inter alia,* the surgical procedures which had been performed upon her, apparently without mentioning the sponge.

Plaintiff was immediately hospitalized at the Orthopedic Institute of the Hospital for Joint Diseases (Joint Diseases). Tests disclosed that a granuloma, i.e., an abnormal mass, had developed along plaintiff's spine between the L3 and L5 vertebrae and was, in fact, eroding the L4 and L5 vertebrae. This granuloma had grown over and around the sponge Lazansky had, in 1966, unequivocally represented to be harmless. Medical staff at Joint Diseases apparently informed plaintiff that the sponge was at the root of her problems and that it should be removed.

From March until May 1986, when the sponge was ultimately removed, plaintiff underwent a variety of treatments, including traction, physical therapy, and the wearing of a support device. She also required pain medication. When the granuloma and sponge were removed, plaintiff was again hospitalized, for a one-to-two-week period.

In 1987, plaintiff was admitted yet again to Joint Diseases, this time for a two-month period. This hospitalization followed a bout of the flu, which plaintiff asserts precipitated an infection, acute osteomyelitis of the spine, at the surgical site. Unquestionably, plaintiff had to undergo numerous procedures, wear a plaster body cast and receive extensive physical therapy, both during and after her hospitalization.

Plaintiff contends that she continues to have substantial pain and muscle spasms and impairment of her physical activities. She also claims that the muscle spasms will ultimately result in arthritis of the spine.

Plaintiff commenced the instant case in April 1987 asserting three causes of action. The first and second causes of action, which are not at issue on appeal, alleged malpractice by the individual and municipal defendants. The third cause of action alleges fraud. Concededly, plaintiff did not attempt to file a notice of claim, pursuant to General Municipal Law § 50-e, until February 1987.[2] In March 1987 plaintiff filed, without

---

2. This purported notice of claim was rejected because it stated that the date the claim arose was December 12, 1987, 10 months after the notice was filed.

leave of the court, an amended notice of claim, which alleged that the claim arose in March 1986, at the onset of her symptoms.

Plaintiff's failure to comply with the statutory provisions was raised by all of the defendants as an affirmative defense set forth in their answer. In August 1989 all of the defendants moved for summary judgment dismissing the complaint, arguing that the action was, in its entirety, barred by plaintiff's failure to move for leave to file a late notice of claim before the expiration of the 1-year-and-90-day Statute of Limitations as required by General Municipal Law § 50-i. Plaintiff conceded that there was no timely service of a notice of claim on the City and HHC, but argued that her claims against Lazansky should, for numerous reasons, not be dismissed.

The IAS court held that the entire action was "barred for failure to file a notice of claim timely." In so holding, the court noted, *inter alia,* that "[w]hile the fraud cause of action is defined to be 'separate from and subsequent to the malpractice' *(Simcuski v. Saeli,* 44 NY2d 442, 452 (1978)) it is hard to say that the injury is not 'sustained by [plaintiff] by reason of the malpractice' of the defendant. GML Sec. 50-d [1]."[3] General Municipal Law § 50-d regards protection of, *inter alia,* doctors who are sued for malpractice committed in the course of municipal employment. On appeal, plaintiff correctly contends that the court erred in holding that General Municipal Law § 50-d applies to that part of the action which alleges fraud on the part of Lazansky, because while the acts of medical malpractice fall within the ambit of General Municipal Law § 50-d, the intentional tort of fraud alleged, which occurred separate from, and subsequent to, the malpractice does not and thus no notice of claim was required as to that claim.[4]

General Municipal Law § 50-d (1) and (2) which were in effect at the relevant times herein,[5] read as follows:

---

3. Regardless of its dismissal, the IAS court noted that the cause of action alleging fraud was sufficient.

4. Plaintiff does not appeal from those portions of the court's order which dismissed the malpractice claims.

5. [2] General Municipal Law § 50-d was amended in 1979 to remove the City from its scope. (L 1979, ch 673, § 5, adding General Municipal Law § 50-d [3].) As of 1979, civil actions against medical personnel employed by the City are covered by General Municipal Law § 50-k. (L 1979 ch 673, § 1; *see also,* McKinney's Uncons Laws of NY § 7401 [6] [New York City Health and Hospitals Corporation Act § 20 (6); L 1969, ch 1016, as amended by L 1979,

"§ 50-d. *Municipal liability for malpractice of certain physicians, resident physicians, internes, dentists, podiatrists and optometrists in public institutions*

"1. Notwithstanding any inconsistent provision of law, general, special or local, or limitation contained in the provisions of any city charter, every municipal corporation shall be liable for, and shall assume the liability, to the extent that *it shall save him harmless, of any resident physician, physician, interne, dentist, podiatrist or optometrist rendering medical, dental, podiatry or optometry services* of any kind to a person without receiving compensation from such person in a public institution maintained in whole or in part by the municipal corporation, or in the course of a home care service maintained by such public institution, *for damages for personal injuries alleged to have been sustained by such person by reasons of the malpractice of such resident physician, physi-*

ch 673, § 9].) Nevertheless, should Lazansky have had a right to representation and indemnification under section 50-d as in effect before the amendment "for any act or omission alleged to have occurred prior to the effective date of the act", he would still have this right. *(See,* L 1979, ch 673, § 12 [a].)

Further, while Lazansky contends that the legislative intent of General Municipal Law § 50-k was to expand the statutory scheme to include, for physicians, acts other than malpractice, because section 50-k does not use the words "medical malpractice" in defining the scope of protection under the statute, this argument must fail. Indeed, the accompanying memorandum of Assemblyman Vincent T. Nicolosi states:

"The purpose of this bill is to amend the General Municipal Law in relation to civil actions brought against officers or employees of any city having a population in excess of one million persons.

"Currently, under state and city law, New York City policemen, firemen, and teachers are indemnified against civil suits arising out of the course of their employment. There is no justification for limiting indemnification to these occupations, however. The ambulance driver who injures some *[sic]* racing to an emergency or the laborer who accidentally injures a pedestrian or motorist with a piece of heavy equipment or flying debris should have an equal right to indemnification. *No employee can aggressively and zealously perform his duties with the spector of possible liability hanging over him. This bill will further enable all New York City public employees to perform up to the high standard which the public expects."* (1979 NY Legis Ann, at 402 [emphasis added].)

Furthermore, General Municipal Law § 50-k (3) states "the duty to indemnify and save harmless * * * shall not arise where the injury or damage resulted from *intentional wrongdoing or recklessness on the part of the employee."* (Emphasis added.) Obviously, the intent was to expand the group of individuals protected, *not the group of acts protected.* In any event, it is unfathomable that the Legislature contemplated protecting acts of intentional fraud, which we decline to view as within the category of "aggressive * * * and zealous * * * perform[ance of an employee's] duties".

*cian, interne, dentist, podiatrist or optometrist while engaged in the rendition of such services.* Every such resident physician, physician, interne, dentist, podiatrist or optometrist for the purpose of this section, shall be deemed an employee of the municipal corporation notwithstanding that the municipal corporation derived no special benefit in its corporate capacity.

"2. No action shall be maintained under this section against such municipality, resident physician, physician, interne, dentist, podiatrist or optometrist unless a notice of claim shall have been made and served in compliance with section fifty-e of this chapter. Every such action shall be commenced pursuant to the provisions of section fifty-i of this chapter."

This statute was derived from former section 50-d, which, when enacted in 1937, in substantially similar wording provided:[6]

"§ 50-d. *Municipal liability for malpractice of certain physicians and dentists in public institutions.* Every municipal corporation, notwithstanding any inconsistent provision of law, general, special, or local, shall be liable for, and shall assume the liability, to the extent *that it shall save him harmless, of any physician or dentist* rendering medical services or dental services of any kind gratuitously to a person in a public institution maintained in whole or in part by the municipal corporation, for damages for personal injuries alleged to have been sustained *by such person by reason of malpractice of such physician or dentist while engaged in the rendition of such services.* Every such physician or dentist, for the purpose of this section, shall be deemed an employee of the municipal corporation, so maintaining such institution, notwithstanding that the municipal corporation derived no special benefit in its corporate capacity.

"No action shall be maintained under this section against such municipal corporation, physician or dentist unless the applicable provisions of law pertaining to the commencement of action and the filing of notice of intention to commence action against such municipal corporation shall be strictly complied with." (L 1937, ch 483, § 1.)

The Legislature, in enacting General Municipal Law § 50-d, thus created a scheme of protection for doctors practicing in public hospitals by granting them indemnification for any malpractice awards against them by "creat[ing] a new remedy

---

6. As the City concedes, the wording of General Municipal Law § 50-d has, in essence, remained unchanged.

against the city in favor of the injured person." *(Derlicka v Leo,* 281 NY 266, 268 [1939].) In 1956, when the statute was amended to include internes and residents within the scope of its protection, it was reaffirmed that the stated purpose was to afford medical personnel protection "from the high exposure to *civil malpractice liability* incident to doing professional work in a municipal hospital, especially in New York City." (1956 NY Legis Ann, at 217 [emphasis added], incorporating a State Medical Society memorandum.)

It is abundantly clear that both the Legislature and the courts were restrictive, as a matter of policy, in the construction of General Municipal Law § 50-d. *(See, Palmer v Nassau County Med. Center,* 135 AD2d 797, 799 [2d Dept 1987]; *Kral v County of Westchester,* 101 AD2d 880 [2d Dept 1984]; *Lium v Ploski,* 87 AD2d 860, 861 [2d Dept 1982].) Thus, while General Municipal Law § 50-d affords municipal medical professionals protection from actions alleging malpractice, that is not to say that it protects them from torts which are distinguishable by both type and time.[7]

The claim of fraud herein arises not from Lazansky's rendition of medical services, but from his disclaimer, some two years after his conceded acts of malpractice, of the substantial harm which could, and in fact did, result from the sponge left in plaintiff's back. *(See, Simcuski v Saeli,* 44 NY2d 442, 451-452 [1978], citing *Calabrese v Bickley,* 1 AD2d 874 [1956].) As to this fraud cause of action against Lazansky, plaintiff's complaint and subsequent pleadings unquestionably allege damages separate and distinct from the malpractice causes of action. *(Simcuski v Saeli, supra; cf., Harkin v Culleton,* 156 AD2d 19 [1st Dept 1990].)[8] We are aware that "without more, concealment by a physician or failure to disclose his own malpractice does not give rise to a cause of action in fraud or deceit separate and different from the customary malpractice action". *(Simcuski v Saeli, supra,* 44 NY2d, at 452.) However, the case at bar appears to be quite a different situation, and plaintiff's claims, if proven, clearly constitute common-law fraud. *(See,* Prosser and Keeton, Torts, at 728 [5th ed].) For this claim, which was outside the scope of General Municipal Law § 50-d, we hold plaintiff was under no

---

7. Our reading of General Municipal Law § 50-k leads us to conclude this is still the case.

8. It is noteworthy that Lazansky did not dispute the merits of the fraud claim in the course of either the prior or instant proceedings.

obligation to file a notice of claim. Further, since the action was commenced within two years of March 1986, when she first learned of Lazansky's fraud concealment, the fraud claim should not have been dismissed as time barred and plaintiff should have her day in court. *(Compare, Harkin v Culleton, supra,* citing CPLR 213 [8]; 203 [f].)

Accordingly, the order of the Supreme Court, Bronx County (Lewis Friedman, J.), entered on or about December 18, 1989, which, *inter alia,* granted defendant Dr. Mark Lazansky's motion for summary judgment dismissing the cause of action sounding in fraud for plaintiff's failure to serve a timely notice of claim, should be unanimously reversed, on the law, the motion denied as to that cause of action, and that cause of action which alleged fraud reinstated, without costs.

Ross, J. P., KASSAL, ELLERIN and RUBIN, JJ., concur.

Order, Supreme Court, Bronx County, entered on or about December 18, 1989, unanimously reversed to the extent appealed from, on the law, without costs and without disbursements, the motion denied as to the cause of action sounding in fraud against defendant-respondent, and that cause of action reinstated.